F. McClure Wallace, Esq.
Nevada Bar No.: 10264
Patrick R. Millsap, Esq.
Nevada Bar No.: 12043
**WALLACE & MILLSAP**
510 W Plumb Ln., Ste. A
Reno, Nevada 89509
(775) 683-9599
mcclure@wallacemillsap.com
patrick@wallacemillsap.com

Will Thompson (*pro hac vice* to be submitted)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wthompson@burnscharest.com

Korey A. Nelson (*pro hac vice* to be submitted)
Patrick D. Murphree (*pro hac vice* to be submitted)
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com
pmurphree@burnscharest.com
*Counsel for Plaintiff City of Laurel, Mississippi*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**NORTHERN DIVISION**

| | |
|---|---|
| CITY OF LAUREL, MISSISSIPPI, on behalf of itself and all others similarly situated,<br><br>                                  Plaintiff,<br><br>            v.<br><br>CINTAS CORPORATION NO. 2<br><br>                                  Defendants. | Civil Action No. ___<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Page **1** of **18**

## CLASS ACTION COMPLAINT

For its complaint against Defendant Cintas Corporation No. 2 ("Cintas"), Plaintiff City of Laurel, Mississippi ("City of Laurel" or the "City") alleges, in its own right and on behalf of all others similarly situated, as follows:

## NATURE OF THE ACTION

1. This is a class action on behalf of all state and local governments, school boards, institutions of higher education, and non-profit organizations that Cintas has repeatedly overcharged by refusing to honor its contractual obligations.

2. In exchange for being awarded two contracts estimated to yield $100 million and $250 million annually, Cintas agreed to rent uniforms, mats, mops, and towels to government and non-profit entities throughout the nation at one consistent price.

3. Unsatisfied with the access to this lucrative market enabled by these contracts, Cintas systematically overcharged its governmental and non-profit customers.

4. By willfully breaching its contractual obligations, Cintas bilked tens of millions of dollars from governments and nonprofits and so prevented them from using that money to serve the public.

5. Plaintiff brings this action on behalf of itself and all other public and non-profit entities in the United States that were contractually entitled to purchase goods and services from Cintas at a single and consistent price, but that were nevertheless overcharged by Cintas.

## PARTIES

6. Plaintiff City of Laurel, Mississippi is a municipality located in Jones County, Mississippi.

7. Defendant Cintas Corporation No. 2 is a corporation incorporated under the laws of the state of Nevada with its principal place of business in Ohio.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). Numerous members of the Proposed Class, including the City of Laurel, Mississippi, are citizens of different states than Cintas. The amount in controversy exceeds $5 million, exclusive of interest and costs, and there are more than 100 putative class members.

9. This Court has personal jurisdiction over Cintas because it is incorporated in the state of Nevada and because Cintas has purposefully directed activities at Nevada residents that have given rise to the claims at issue in this case.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because Cintas resides in the State of Nevada. Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the omissions giving rise to Plaintiff's claims were committed in this district.

11. Venue is proper in the Unofficial Northern Division of the District of Nevada pursuant to LR IA 1-8(a) because the office of Cintas's registered agent is located in Carson City, Nevada, which lies within this unofficial division.

## FACTUAL BACKGROUND

A. U.S. Communities

12. The U.S. Communities Government Purchasing Alliance ("U.S. Communities"), which is not a party to this lawsuit, is a purchasing cooperative made up of state and local governments, school districts, higher education institutions, and non-profit organizations throughout the United States. In 2018, U.S. Communities became a subsidiary of Omnia Partners, Inc. and, as of February 26, 2019, operates under the "Omnia Partners, Public Sector" brand.

13. Any state, county, city, special district, local government, school district, private K-12 school, technical or vocational school, higher education institution, government agency, or nonprofit organization may register with U.S. Communities. Registrants are known as Participating Public Agencies ("PPAs").

14. U.S. Communities leverages the PPAs' collective buying power to obtain goods and services at a lower cost than would be available were each PPA to contract with suppliers individually.

15. U.S. Communities obtains these cost savings by using the lead public agency model.

16. Under this model, U.S. Communities selects a public agency, referred to as a Lead Public Agency, to issue a Request for Proposals (an "RFP"), solicit proposals from suppliers, evaluate those proposals, and award a contract. This contract is known as a Master Agreement.

17. The Master Agreement incorporates a list of prices that the supplier will charge for the goods and services requested in the RFP.

18. Any PPA may "piggyback" on the Master Agreement by executing an individual contract with the supplier; this contract incorporates the Master Agreement's pricing. Because the Lead Public Agency has used an RFP process, PPAs can access the lower prices obtained through cooperative purchasing without the need to conduct their own competitive bidding processes.

19. As part of its response to the RFP, a supplier must execute a contract with U.S. Communities; this contract is known as an "Administration Agreement."

20. In an Administration Agreement, a supplier represents that "the pricing offered under the Master Agreement is the lowest overall available pricing (net to purchaser) on Products and Services that it offers to Public Agencies."

21. The Administration Agreement also requires a supplier to make several corporate commitments, including:

> i. The pricing, terms and conditions of the Master Agreement shall, at all times, be Supplier's primary contractual offering of Products and Services to Public Agencies. All of Supplier's direct and indirect marketing and sales efforts to Public Agencies shall demonstrate that the Master Agreement is

Supplier's primary offering and not just one of Supplier's contract options.

    ii. Supplier's sales force (including inside, direct and/or authorized dealers, distributors and representatives) shall always solely[1] present the Master Agreement when marketing Products or Services to Public Agencies.

    iii. Supplier shall advise all Public Agencies that are existing customers of Supplier as to the pricing and other value offered through the Master Agreement.

    iv. Upon authorization by a Public Agency, Supplier shall transition such Public Agency to the pricing, terms and conditions of the Master Agreement.

    v. Supplier shall ensure that the U.S. Communities program and the Master Agreement are actively supported by Supplier's senior executive management.

22. In addition, the Administration Agreement contains an audit provision:

> Supplier shall, at Supplier's sole expense, maintain an accounting of all purchases made by Lead Public Agency and Participating Public Agencies under the Master Agreement. . . . . U.S. Communities shall have the authority to conduct random audits of Supplier's pricing that is offered to Participating Public Agencies at U.S. Communities' sole cost and expense. Notwithstanding the foregoing, in the event that U.S. Communities is made aware of any pricing being offered to Participating Public Agencies that is materially inconsistent with the pricing under the Master Agreement, U.S. Communities shall have the ability to conduct an extensive audit of Supplier's pricing at Supplier's sole cost and expense.

23. The Administration Agreement incorporates the Master Agreement by reference. The Master Agreement incorporates the RFP and the supplier's response.

---

[1] The Administration Agreement in effect at the time of the 2018 Master Agreement did not contain the word "solely."

24. In a Master Agreement, a supplier agrees to extend the same pricing to all PPAs.[2]

25. In exchange for guaranteeing consistent and low pricing to any PPA, a supplier awarded a U.S. Communities contract receives marketing assistance, government sales training, and access to an online marketplace where PPAs can search for new suppliers offering piggyback contracts on master agreements.

26. To piggyback on a Master Agreement, a PPA executes a contract with the supplier that incorporates the pricing structure of the Master Agreement, but allows the PPA and the supplier to directly negotiate the length of their agreement and procedures for ordering, delivery, inspection, acceptance, invoicing, and payment.

27. As of July 2018, over 55,000 PPAs used U.S. Communities contracts to procure over $2.5 billion in products and services annually.

B. The 2012 Master Agreement

28. Harford County Public Schools ("HCPS") is a school system located in Maryland.

29. HCPS serves as the Lead Public Agency for several U.S. Communities contracts.

30. On January 12, 2012, the HCPS issued Request For Proposals No. 12-JLH-011 (the "HCPS RFP") as the Lead Public Agency on behalf of itself and other PPAs.

31. The HCPS RFP sought proposals from qualified companies "to provide a comprehensive solution of a broad scope of facilities solutions on a national level, including the rental and service of uniforms, mats, mops, and towels and other related products and facilities solutions."

32. The HCPS RFP estimated that PPAs would purchase more than $100 million of goods and services annually under the proposed master agreement.

---

[2] The Administration Agreement does allow a supplier, in limited circumstances, to offer particular PPAs a price lower than that provided by the Master Agreement, but a supplier may never charge a PPA a price higher than that provided in the Master Agreement.

33. In addition to a Technical Proposal explaining a company's qualifications and its ability to provide goods and services at high volume to customers throughout the nation, the HCPS RFP required responding suppliers to submit Price Proposal for

     a. weekly rental (with cleaning) of an allotment of 11 shirts and 11 trousers;

     b. weekly lease (without cleaning) of an allotment of 10 shirts and 5 trousers;

     c. weekly rental of an allotment of 3 coveralls.

These prices were to be inclusive of all fees and service charges. Suppliers were also invited to submit pricing for other associated products and services they were prepared to offer under a master agreement.

34. The HCPS RFP also required responding suppliers to guarantee the accuracy of all invoices and billing documents and warned that "[r]epeated instances of inaccurate, or over-billing may result in contract termination."

35. At least two companies responded to the HCPS RFP, one of which was Cintas.

36. Upon information and belief, as part of its response to the HCPS RFP, Cintas submitted a signed Administration Agreement and a Price Proposal.

37. Cintas had the winning proposal, and on or about April 10, 2012, HCPS and Cintas executed Contract No. 12-JLH-011C (the "2012 Master Agreement"). The 2012 Master Agreement was "made on behalf of [HCPS] and other participating governmental agencies, through the U.S. Communities Purchasing Alliance."

38. The 2012 Master Agreement stated that "[t]he [HCPS RFP] is incorporated in its entirety and included as part of this agreement."

39. In addition, Cintas "agree[d] to accept as compensation for the products provided pursuant to this Master Agreement, the following: the price proposal set forth in the best and final RFP Response, dated March 15, 2012 and marked

Page **7** of **18**

Amendment 1."

40. In the 2012 Master Agreement, Cintas also agreed "to extend the same terms, covenants and conditions available to HCPS under this Master Agreement to other government agencies ('Participating Public Agencies') that, in their discretion, desire to access this Master Agreement."

41. The initial term of the Master Agreement was three years from on or about April 1, 2012. The Master Agreement was renewed twice by mutual written agreement and was in effect until March 31, 2019.

42. The Master Agreement was amended six times to reflect updated pricing agreed upon by Cintas and HCPS.

43. Under the 2012 Master Agreement, the Administration Agreement, and PPAs' individual piggyback contracts, Cintas was required to charge each PPA no more than the prices set out in the Pricing Proposal and the amendments to the Master Agreement.

C. The 2018 Master Agreement

44. Prince William County Public Schools ("PWCS") is a school system located in Virginia.

45. PWCS serves as the Lead Public Agency for several U.S. Communities master agreements.

46. On July 17, 2018, PWCS issued RFP No. R-BB-19002 (the "PWCS RFP") as the Lead Public Agency on behalf of itself and all PPAs.

47. The PWCS RFP sought proposals from qualified companies to provide a broad range of facilities management products and solutions including (1) uniform purchase, rental, and lease; (2) mat, mop, and cleaning cloth services; (3) restroom supplies and replenishment services; (4) deep cleaning; (5) first aid and safety; (6) AEDs; (7) fire protection; and (8) related products and services.

48. The PWCS RFP estimated that Participating Public Agencies would purchase more than $250 million annually under the proposed master agreement.

49. In addition to material explaining a company's qualifications and its ability to provide goods and services at high volume to customers throughout the nation, the PWCS RFP required responding suppliers to submit a detailed list of proposed prices. Suppliers were also invited to submit pricing for other associated products and services they were prepared to offer under a master agreement.

50. At least two companies responded to the PWCS RFP, one of which was Cintas.

51. Upon information and belief, as part of its response to the PWCS RFP, Cintas signed the Administration Agreement and submitted a Price Proposal.

52. Cintas had the winning proposal, and on or about December 13, 2018, PWCS and Cintas executed Contract No. R-B-19002 (the "2018 Master Agreement"). The 2018 Master Agreement was "made on behalf of all states, local governments, school districts, and higher education institutions in the United States of America, and other governmental agencies and nonprofit organizations."

53. The 2018 Master Agreement incorporates a Memorandum of Negotiations, which itself incorporates the RFP and Cintas's proposal, responses to negotiations, and best and final offer.

54. In addition, the 2018 Master Agreement confirms that the price quotes contained in Cintas's clarification response of September 25, 2018 and the list of prices/rates negotiated on September 25, 2018 constitute the compensation that Cintas agrees to accept for products and services under the 2018 Master Agreement. These prices are reflected on the "Master Agreement Commodity List," MA Document Number MA 041 R-BB-19002-A.

55. The initial term of the 2018 Master Agreement is five years from the date of award to October 32, 2023, with the option to renew for two two-year terms.

56. Under the 2018 Master Agreement, the Administration Agreement, and PPAs' individual piggyback contracts, Cintas cannot charge any PPA more than the prices set out in the Pricing Proposal and any amendments approved by PWCS.

D. Cintas has systematically overcharged PPAs for products and services covered by the 2012 and 2018 Master Agreements.

57. Members of the Proposed Class entered into piggyback contracts under the 2012 and/or 2018 Master Agreements.

58. During the nearly nine years that the Master Agreements have been in effect, Cintas has continually and systematically overcharged PPAs for the goods and services obtained under piggyback agreements by billing PPAs more than the prices set out in the Master Agreements.

59. Cintas's willful breach of its contractual obligations financially damaged governmental, educational, and non-profit institutions nationwide.

60. Through its misconduct, Cintas has effectively stolen more than $16 million annually from the coffers of public agencies and nonprofits.

E. Cintas overcharged the City of Laurel by more than 16 percent.

61. On July 1, 2017, the City of Laurel and Cintas entered into a Facilities Solutions Agreement for the rental of uniforms, mats, and towels. This contract piggybacks on the 2012 Master Agreement.

62. The contract ("Laurel Piggyback") includes "US Communities Participating Public Agencies Terms," in which Cintas

> agrees to extend the same terms, covenants agreed to under the Master Agreement with Lead Public Agency [HCPS] to other government agencies ([PPAs]) that, in their discretion, desire to access the Master Agreement in accordance with all terms and conditions contained herein or attached hereto.

63. Thus, the Laurel Piggyback entitles the City of Laurel to the same prices offered in the Master Agreement.

64. When the City of Laurel entered into the Laurel Piggyback, Amendment No. 6 to the 2012 Master Agreement contained the current list of prices for Cintas's goods and services. All PPAs, including the City of Laurel, were entitled to receive the prices established in Amendment No. 6.

65.  These prices were memorialized in a document entitled "G &K Services/Cintas" attached to the Laurel Piggyback.

66.  After entering into the Laurel Piggyback, the City of Laurel began making weekly rentals of uniforms and floor mats from Cintas.

67.  The City of Laurel decided to investigate whether it was, in fact, being charged the prices it was promised under the 2012 Master Agreement. Thus, the City requested that Cintas provide records of all purchases the City had made under the Laurel Piggyback between July 1, 2017 and October 31, 2018.

68.  Despite Cintas's contractual obligation to maintain accounts for purchases made by PPAs under the Master Agreement for a period of three years from the date of purchase, Cintas responded to the City's record request by stating that it could not locate all of the invoice data.

69.  Ultimately, Cintas only provided the City with purchase records from March 14, 2018 through October 31, 2018. Cintas's failure to maintain all records dating back to the inception of the Laurel Piggyback on July 1, 2017 is a direct breach of the Administration Agreement.

70.  Although the City did not have the full records from July 1, 2017 through October 31, 2018, it commenced an audit using the seven months of data that Cintas did provide.

71.  The City performed its audit by comparing the cost of goods and services under the 2012 Master Agreement and Amendment 6, as memorialized in the attachment to the Laurel Piggyback, with the amount that Cintas charged the City for each good and service.

72.  The City discovered that during that period, Cintas had charged the City 16.6% more than the prices guaranteed under the 2012 Master Agreement and the Laurel Piggyback.

73.  More specifically, the audit revealed that out of a total of $11,543.01 paid by the City under the Laurel Piggyback, Cintas overcharged the City by

$1,920.10. The audit identified 770 separate occasions where Cintas overcharged the City over the course of seven months.

74. In addition, the audit identified another $1,174.07 in projected additional savings for a total credit of $3,094.17 due to the City.

75. Had the City had access to all of the invoices and records that Cintas was contractually required to maintain, the audit would undoubtedly have identified more overcharges.

76. By invoicing the City for amounts exceeding those authorized under the 2012 Master Agreement and thereby representing that the City owed these excessive prices, Cintas breached the 2012 Master Agreement, the Administration Agreement, and the Laurel Piggyback.

## CLASS ALLEGATIONS

77. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action as a class action for itself and all other PPAs whom Cintas has repeatedly overcharged for products and services under the 2012 and 2018 Master Agreements.

78. Specifically, Plaintiff seeks to represent the following class:

79. All U.S. Communities or Omnia Partners, Public Sector PPAs that have entered into contracts with Cintas for the rental or lease of products that piggyback on the 2012 and/or 2018 Master Agreements.

80. Plaintiff seeks to recover the damages sustained by the class as a result of Cintas's breach of its contracts with the PPAs.

81. All members of the Proposed Class are readily ascertainable. Cintas and U.S. Communities both have access to addresses and other contact information for all members of the Proposed Class. This information can be used to provide notice to Proposed Class members.

82. *Numerosity*. The Proposed Class is so numerous that joinder of all members is impracticable. While the precise number of Proposed Class members has

not been determined at this time, more than 55,000 entities utilize U.S. Communities contracts to procure products and services annually. The estimated value of products and services to be purchased under the 2012 Master Agreement was $100 million annually and the estimated value under the 2018 Master Agreement is $250 million annually. Therefore, the public and nonprofit entities impacted by Cintas's misconduct are sufficiently numerous to merit class certification.

83. ***Commonality***. Questions of law and fact common to all Proposed Class members exist and predominate over any questions affecting only individual Proposed Class members, including, *inter alia*, whether Cintas:

   a. Engaged in the wrongful conduct alleged in this Complaint;
   b. Responded to the HCPS and PWCS RFPs with price proposals that were the lowest available pricing Cintas offered to public agencies;
   c. Entered into the 2012 and 2018 Master Agreements;
   d. Executed Amendments No. 1-6 to the 2012 Master Agreement;
   e. Bound itself to inform PPAs of the prices for products and services available under the 2012 and 2018 Master Agreements;
   f. Bound itself to charge no more than the prices established in the 2012 and 2018 Master Agreements to any PPA;
   g. Entered into contracts with PPAs that piggybacked on the 2012 and 2018 Master Agreements;
   h. Charged PPAs more than the prices established in the 2012 and 2018 Master Agreements;
   i. Failed to retain the records of PPAs' purchases under the 2012 and 2018 Master Agreements for three years from the date of purchase.

84. ***Typicality***. Plaintiff's claims are typical of the claims of the Proposed Class. Plaintiff and all members of the Proposed Class were injured through the uniform misconduct described above and assert the same claims for relief.

85. ***Adequacy***. Plaintiff and its counsel will fairly and adequately represent

the interests of the members of the Proposed Class. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the members of the Proposed Class. Plaintiff's lawyers are highly experienced in the prosecution of consumer class actions and complex commercial litigation.

86. ***Superiority***. A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiff and the members of the Proposed Class. Plaintiff and the members of the Proposed Class have been harmed in identical ways by Cintas's wrongful overcharging of them for goods and services under the 2012 and 2018 Master Agreements. Litigating this case as a class action will reduce the possibility of repetitious litigation relating to Cintas's misconduct.

87. ***Predominance.*** Because every PPA's piggyback contract incorporated the pricing established in the 2012 and 2018 Master Agreements, the same evidence will suffice to establish Cintas's contractual duty. Because the Administration Agreements and the 2012 and 2018 Master Agreements obliged Cintas to offer and charge those prices uniformly, its breach of those obligations can likewise be established on a class-wide basis. Determining the extent to which Cintas overcharged a particular PPA by invoicing for more than the price in the relevant master agreement will be merely a clerical exercise.

88. Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because these common questions of law or fact predominate over any questions affecting individual members of the Proposed Class and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

89. Because Cintas has consistently overcharged the members of the Proposed Class, it has acted on grounds generally applicable to all members of the Proposed Class, rendering final injunctive or corresponding declaratory relief appropriate.

90. Class certification is thus appropriate under Rule 23(b)(2) of the Federal

Rules of Civil Procedure in order to declare that Cintas has breached its contractual obligations under the Administration Agreements and the 2012 and 2018 Master Agreements and to enjoin it from continuing to fleece governments, schools, and nonprofits.

91. The expense and burden of litigation would substantially impair the ability of Plaintiff and members of the Proposed Class to pursue individual lawsuits to vindicate their rights. Absent a class action, Cintas will retain the benefits of its wrongdoing despite its serious contractual violations.

## CAUSES OF ACTION

**Count 1: Breach Of Contract**

92. Plaintiff and the members of the Proposed Class entered into piggyback agreements with Cintas for the purchase, rental, and/or lease of certain goods and services.

93. In the piggyback agreements, Cintas promised Plaintiff and the members of the Proposed Class that it would charge them, as PPAs, the prices established in the 2012 and 2018 Master Agreements.

94. Plaintiff and the Proposed Class leased and/or rented substantial amounts of goods and services from Cintas.

95. Cintas failed to provide Plaintiff and the members of the Proposed Class with the prices agreed to in the 2012 and 2018 Master Agreements.

96. By overcharging Plaintiff and the members of the Proposed Class, Cintas breached its contracts with them.

97. In the 2012 Master Agreement, Cintas agreed to extend the same terms, covenants, and conditions available to HCPS under the 2012 Master Agreement to Plaintiff and the members of the Proposed Class. Accordingly, Plaintiff and the members of the Proposed Class are third-party beneficiaries of the 2012 Master Agreement.

98. By overcharging Plaintiff and the members of the Proposed Class,

1 Cintas breached the 2012 Master Agreement.

2 99. In the 2018 Master Agreement, Cintas agreed to extend the same terms, covenants, and conditions available to PWCS under the 2018 Master Agreement to Plaintiff and the members of the Proposed Class. Accordingly, Plaintiff and the members of the Proposed Class are third-party beneficiaries of the 2018 Master Agreement.

100. By overcharging Plaintiff and the members of the Proposed Class, Cintas breached the 2018 Master Agreement.

101. Additionally, Cintas entered into two Administration Agreements with U.S. Communities.

102. Each Administration Agreement recited U.S. Communities and Cintas's desire to enter into the Administration Agreement in order to make the associated Master Agreement available to PPAs. Accordingly, Plaintiff and the members of the Proposed Class are third-party beneficiaries of the Administration Agreements.

103. Cintas has breached the Administration Agreements in multiple ways, including by: falsely representing that the pricing offered under the Master Agreement is the lowest overall available pricing offered to public agencies; by failing to ensure that the pricing, terms, conditions of the Master Agreement are Cintas's primary contractual offering at all times; failing to always present the Master Agreement when marketing products or services to public agencies; failing to advise all public agencies that are customers of Cintas as to the pricing and other value offered through the Master Agreement; failing to transition public agencies to the pricing, terms, and conditions of the Master Agreement.

104. As a result of Cintas's wrongful conduct, the City and the Proposed Class have suffered damages in an amount to be determined at trial.

## JURY DEMAND

105. Plaintiffs demand a jury trial on all issues.

# PRAYER FOR RELIEF

The City, on behalf of itself and the Proposed Class, respectfully request that this Court enter judgment in their favor and award relief as follows:

a. all damages to which Plaintiffs and the members of the proposed class are entitled, including but not limited to compensatory damages, consequential damages, pre- and post-judgment interest, fees and costs of this suit, and all other sums allowed by law;

b. declaring that Cintas has breached its obligations under the Administration Agreements, the 2012 and 2018 Master Agreements, and the PPAs piggyback agreements, and enjoining Cintas from continuing to charge PPAs more than the prices established in the 2018 Master Agreement; and

c. such other relief that this Court deems appropriate.

**DATED** this 11th day of March, 2021.

By: /s/ *F. McClure Wallace & Patrick R. Millsap* .
*F. McClure Wallace*, Esq.
Nevada Bar No.: 10264
*Patrick R. Millsap*, Esq.
Nevada Bar No.: 12043
*Wallace & Millsap*
510 W Plumb Ln., Ste. A
Reno, Nevada 89509
(775) 683-9599
mcclure@wallacemillsap.com
patrick@wallacemillsap.com

Will Thompson (*pro hac vice* to be submitted)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wthompson@burnscharest.com

Korey A. Nelson (*pro hac vice* to be submitted)
Patrick D. Murphree (*pro hac vice* to be submitted)
**BURNS CHAREST LLP**
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com
pmurphree@burnscharest.com